UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| A-QUICK PICK CRANE SERVICE, INC., et al.,<br>　　Plaintiffs,<br><br>　　v.<br><br>GRANGE MUTUAL CASUALTY CO.,<br>　　Defendant. | No. 3:21-cv-169 (SRU) |

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This action arises from a workplace injury allegedly caused by a crane leased by Plaintiff A-Quick Pick Crane Service ("AQP"). Defendant Grange Mutual Casualty, Co. ("Grange") insured AQP for the construction project, but refused to defend or indemnify AQP when the worker sued AQP for his workplace injury. Ironshore Specialty Insurance Co. ("Ironshore"), AQP's secondary insurer, paid AQP's legal fees and expenses in the workplace injury action and provided the proceeds to settle that action. Ironshore has joined AQP as a co-plaintiff and brings a claim of equitable subrogation against Grange.

AQP, Ironshore, and Grange have all moved for summary judgment. For the reasons set forth below, I **grant in part and deny in part** AQP and Ironshore's Motion for Summary Judgment, **doc. no. 47**, and **deny** Grange's Motion for Summary Judgment, **doc. no. 48**.

I. **Background**

A. Factual History

Luis Meza was working on a commercial apartment construction project in Norwalk, Connecticut when he was struck and injured by a crane.[1]  *See generally* Am. Compl., *Meza v. Merritt River Partners, LLC, et al.*, 3:16-cv-1871 (SRU), Doc. No. 62.  AQP was leasing that crane at the time of Meza's alleged workplace injury (the "Meza Incident Crane").  *See generally id.*  Meza sued AQP and others for negligence and negligent supervision.  *See generally id.*  Meza settled his claims against AQP in 2022.  *Meza*, Doc. No. 276 at 2.  AQP now seeks a declaratory judgment that Defendant Grange breached its contractual duty to defend and indemnify AQP for liabilities stemming from the *Meza* crane incident.  Ironshore is an intervenor co-plaintiff who insured AQP for liabilities stemming from the *Meza* action.

The general contractor for the Norwalk apartment project hired Patriot Carpentry ("Patriot") as a subcontractor.  Doc. No. 47-2 ¶ 4.  Patriot shares ownership with US Framing and is largely treated as the same entity for the purposes of this action (collectively, "US Framing").  *See* Doc. No. 49-9.  US Framing leased a crane and hired a crane operator from AQP.  *See* Doc. No. 47-2 ¶ 13-14, 19.  To obtain insurance for the project, US Framing worked with Van Meter Insurance ("Van Meter"), its insurance broker.  *See generally* Doc. No. 47-7; *see also* Doc. No. 47-2 ¶ 11.  US Framing obtained a Commercial Package insurance policy—the "Grange Policy"—from defendant Grange.  *Id.* ¶ 21.

---

[1] The facts are drawn from the parties' Local Rule 56(a)1 Statements, affidavits of witnesses competent to testify about the facts at trial, or other evidence that would be admissible at trial.  D. Conn. L. Civ. R. 56(a)3.

1. *The Grange Policy*

US Framing was a Named Insured on the Grange Policy from its inception. *See* Grange Policy, Doc. No. 47-9 at 2. Due to an oversight, Patriot was not originally a Named Insured on the Grange Policy. Doc. No. 49-9 at 4. US Framing sent a request to Van Meter to add Patriot to the Policy as an Additional Named Insured. *See* Doc. No. 49-9. Grange has an established process for doing so. First, US Framing contacts Van Meter, who fills out a Commercial Policy Change Request form. Doc. No. 49 ¶¶ 18, 21. Van Meter indicates proposed changes on the form—for example, whether the insured wants to add another entity as an "Additional Name Insured" or a "Loss Payee" on the policy. *See generally* Doc. No. 49-9. Van Meter sends the request to Grange for its "Endorsement." Doc. No. 49 ¶ 21. Through that process, US Framing added Patriot as a Named Insured on the Grange Policy. *Id.* ¶ 18.

The Grange Policy's "Endorsement CG 19", doc. no. 47-9 at 95-102, also sets forth conditions for how entities like AQP may become an Automatic Additional Insured on the Grange Policy:

> **XI. Additional Insured – Lessor of Leased Equipment – Automatic Status When Required In Written Lease Agreement With You**
> A. **SECTION II – WHO IS AN INSURED** is amended to include as an additional insured any person or organization from whom you lease equipment when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an insured only with respect to liability for "bodily injury", "property damage", or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person or organization. A person's or organization's status as an additional insured under this provision XI. ends when their contract or agreement with you for such leased equipment ends.
>
> \*    \*    \*
>
> **XII. Blanket Primary and Noncontributory**

3

> **A. SECTION IV-COMMERCIAL GENERAL LIABILITY CONDITIONS,**
> **4. Other Insurance** is amended by the addition of the following:
>> c. **Primary and Noncontributory**
>> Insurance provided under this policy shall apply on a primary basis and shall not seek contribution from any other insurance available to an additional insured added to this policy by provisions **VIII., IX., X.,** and **XI.,** subject to the following conditions:
>>> 1. A written contract between the Named Insured and the additional insured requires this insurance to be primary and noncontributory to other insurance available to the additional insured.

Grange Policy, Doc. No. 47-9 at 99.[2]

2. *The Bare Rental Lease Agreement*

When US Framing hired AQP for the construction project, AQP and US Framing negotiated a Bare Rental Lease Agreement ("Lease Agreement" or "Lease").[3] *See* Doc. No. 50-4. AQP agreed to lease a crane to US Framing as "a bare rental for the machine only. Insurance, maintenance, labor, . . . will be at an additional expense to US Framing." *Id.* at 1. The Lease covered "RENTAL-ONE (1) Used 2012 Potain Model Igo T130, . . . [serial number] 416260." *Id.* (emphasis added). The "Length of Rental" was for "04 months, thereafter at option of lessor and lessee." *Id.* at 2. The actual term of the rental ran longer. *See* S. Schrade Dep., Doc. No. 50-16 at 18-19 ("The job kept going on so they needed the crane so it just kept – kept going. . . . And they continued to pay for it. Q. And that was by agreement; correct? A. Yes."); *see* J. Schrade Dep., Doc. No. 65-3 at 11 (testifying that the crane was used for almost six months, "for the period from November 6th of 2014 to the end of April of 2015," and that US Framing paid AQP "for the use of that crane in accordance with the terms of the bare rental [Lease]

---

[2] Although the numbering of section XII of the Grange Policy appears odd, this excerpted quotation is accurate and unmodified.
[3] US Framing signed the Lease, but AQP did not. *See* Doc. No. 50-4 at 2. The parties do not dispute the Lease's enforceability on that ground.

agreement"); *see* US Framing's Responses to AQP's Requests for Admission, Doc. No. 65-4 at 4 (US Framing's admission that it paid each of AQP's invoices for the actual crane rental period).

The Lease required US Framing to acquire "Full Insurance," including "comprehensive public liability insurance." Doc. No. 50-4 at 2, 3. "Lessor"—here, AQP—"shall be named as an additional insured without limitation on Lessee's insurance and the additional insured endorsement shall state that the coverage is primary to any and all other available insurance. Lessee agrees to supply the Lessor, upon its request, evidence of insurance." *Id.* at 3. The Lease contained a merger provision specifying that it could only be modified through written agreement. *Id.* at 6.

3. *The Meza Incident Crane*

AQP did not own a Potain Model Igo T130 self-erecting crane, so it rented a crane through Shawmut Equipment Company and leased that crane to US Framing. J. Schrade Dep., Doc. No. 67-3 at 6, 8. AQP was originally going to lease the 2012 #416260 crane identified in the Lease. *See* J. Schrade Dep., Doc. No. 65-3 at 13; Lease, Doc. No. 50-4 at 1. The construction project, however, incurred a delay while US Framing sought permission from the Metro-North Railroad to set up the crane. J. Schrade Dep., Doc. No. 65-3 at 12.[4] When Metro-North finally approved the crane, the 2012 #416260 crane was in use on a different project. *Id.* at 13. Shawmut instead leased a 2014 crane, serial number #603227 to AQP, which in turn leased that crane to US Framing. *See id.* at 14. The 2014 #603227 crane was in use at the construction site when the Meza Incident occurred. *See id.* at 11, 18.

---

[4] The project also lagged due to a delay in obtaining materials and railroad liability insurance. *Id.*

4. *The Short Term Crane Agreement*

Once construction had commenced, US Framing signed AQP's standard form Short Term Crane Agreement ("Crane Agreement"). Doc. No. 49-7 at 2. According to AQP, the Short Term Crane Agreement's only meaningful utility for the Norwalk apartment construction project was to track the crane operator's hours. Doc. No. 50 at 18; *see also* Doc. No. 49-7 at 2 (tracking the crane operator's hours); Schrade Dep., Doc. No. 50-16 at 17. The Crane Agreement contains a merger provision. Doc. No. 49-7 at 3.

B. Procedural History

AQP originally filed this action in Connecticut state court. Doc. No. 1; *see also* Doc. No. 46 at 2. The defendants timely removed. *See id.* AQP voluntarily dismissed US Framing, Patriot, US Framing International, LLC, and US Framing Holdings, Inc. as defendants, leaving Grange as the sole defendant. Doc. No. 17 at 1. On January 10, 2022, I granted Ironshore's motion to join as a co-plaintiff. Doc. No. 27. Ironshore had paid the defense costs and settlement for AQP in *Meza v. Merritt River*. Lee Aff., Doc. No. 50-25 ¶¶ 11-12.

AQP moved for partial summary judgment on the issue of liability, and Grange cross-moved for summary judgment in full. Docs. No. 47-48. I heard oral argument on February 5, 2024. Min. Entry, Doc. No. 60. At the hearing, I ordered supplemental discovery in order to ascertain which crane was on the jobsite when the Meza Incident occurred. The parties took supplemental discovery and filed supplemental briefing in July 2024.

II.     **Standard of Review**

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (nonmoving

party must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (the court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").  When a motion for summary judgment is properly supported by documentary and testimonial evidence, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992).  If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

The same standard applies to cross-motions for summary judgment. A court must "assess each motion on its own merits and . . . view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inference in favor of that party." *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021) (quoting *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011)).

**III. Discussion**

Grange's records show AQP as a "Loss Payee," but not as an "Additional Insured." It is undisputed that both US Framing and Patriot are Named Insureds on the Grange Policy. It is also undisputed that in order for AQP to collect on the Grange Policy, AQP must be an Additional Insured.

Under the Grange Policy's Endorsement CG 19, to become an "Automatic" Additional Insured on a primary basis with respect to liability for bodily injury, the following conditions must be satisfied. The Named Insured—here, US Framing—must (a) lease equipment from AQP and (b) "agree[] in writing in a contract or agreement that such person or organization be added as an additional insured." Grange Policy, Doc. No. 47-9 at 99. That contract must (c) require the "insurance to be primary and noncontributory to other insurance available to the additional insured." *Id.* Additionally, (d) the equipment lease must have been executed before the Meza Incident and (e) must not have expired before the Incident. *See id.*

A. The Lease Agreement Controls

The parties dispute which contract controls. Grange argues that the Short Term Crane Agreement alone disposes of this action, and AQP argues the Lease alone disposes of this action.

I turn to the Grange Policy's plain language to determine if the 2014 #603227 Meza Incident Crane must precisely match the year and serial number of the crane identified in the Lease. "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *Ah Min Holding, LLC v. City of Hartford*, 217 Conn. App. 574, 585-86 (2023) (quoting *Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 498 (2000)).

Additional Insureds under the Grange Policy include "any person or organization from whom you"—the Named Insured—"lease equipment when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy." Grange Policy, Doc. No. 47-9 at 99. The Lease did so. It required US Framing, the Named Insured, to name AQP as an additional insured on a primary

9

basis. Lease, Doc. No. 50-4 at 3 ("Lessor shall be named as an additional insured without limitation on Lessee's insurance and the additional insured endorsement shall state that the coverage is primary to any and all other available insurance.").

Grange argues I should look to the Crane Agreement, not the Lease, to determine if AQP is an Automatic Additional Insured. I disagree. The Lease preceded the Crane Agreement. The Crane Agreement contains no clear written modification of the Lease. The Crane Agreement's terms do not reflect any intent on behalf of AQP or US Framing to modify the Lease.[5] The Crane Agreement is a different kind of contract than the Lease. It identifies the crane's lessee, the job site location, the crane operator, and the crane operator's hours. *See* Crane Agreement, Doc. No. 49-7 at 2. The Crane Agreement and the Lease overlap insofar as they both contain provisions identifying the crane(s), indemnification provisions, and merger clauses. *Compare generally*, Lease, Doc. No. 50-4 *with* Crane Agreement, Doc. No. 49-7.

Grange additionally argues that AQP did not perform its obligations under the Lease because it provided a different crane than the one identified in the Lease. Mem. of Law, Doc. No. 48-1 at 12. That argument is unavailing. To become an Automatic Additional Insured under the Grange Policy, AQP must (a) enter into a contract with US Framing that requires AQP to be added as an additional insured, (b) lease equipment to US Framing, and (c) lease the equipment to US Framing while its lease of that equipment was in effect. AQP has met those three requirements.

---

[5] Grange claims that the Crane Agreement's merger clause evinces intent to replace the Lease as the only operative agreement regarding indemnification for liability. A merger clause in a later agreement is not itself sufficient evidence to show that the contracting parties intended to replace or modify an earlier agreement. *Cf. Ass'n Res., Inc. v. Wall*, 298 Conn. 145, 189-90 (2010) ("The meaning to be given subsequent agreements depends on the intention of the parties. . . . [B]ecause the language of the 2005 contract did not expressly address the defendant's obligations" in an earlier contract, "we conclude that the trial court properly rejected the defendant's" claim that the merger clause in the later contract modified the earlier contract) (cleaned up).

First, as discussed above, the Lease required US Framing to add AQP as an additional insured to the policy. Second, AQP leased "equipment"—a crane—to US Framing. J. Schrade Dep., Doc. No. 65-3 at 10-11. Third, AQP leased a crane to US Framing "from November 6th of 2014 to the end of April of 2015," while the Lease was in effect. *Id.* at 11.[6] Although the mismatched crane years and serial numbers may have created confusion, any ambiguity arising from mismatched serial numbers is not ambiguity that "emanate[s] from the language used in the contract." *Ah Min Holding*, 217 Conn. App. at 586. Despite the cranes' different years and serial numbers, AQP leased a crane to US Framing during the Lease's contractual period.

Furthermore, AQP performed its contractual obligations under the Lease. The Lease does not provide for a particular course of conduct if the lessor leases nonconforming goods. Under Connecticut law, a lessee's rejection of nonconforming goods "must be within a reasonable time after their delivery or tender and is not effective unless the lessee notifies the lessor within a reasonable time." Conn. Gen. Stat. § 42a-2A-725(b). Although the 2014 #603227 crane that was actually leased was different than the 2012 #416260 crane identified in the Lease, the record indicates that US Framing accepted the 2014 #603227 crane. *See* J. Schrade Dep., Doc. No. 65-3 at 11; *see also* US Framing Responses to AQP's Requests for Admission, Doc. No. 65-4 at 4 (US Framing paid AQP's crane rental invoices); S. Schrade Dep., Doc. No. 50-16 at 18-19.

I therefore hold that AQP became an Automatic Additional Insured to the Grange Policy when US Framing signed the Lease. Grange was obligated to indemnify and defend AQP in *Meza v. Merritt River*. Grange breached its contract with AQP, an insured entity under its

---

[6] Grange alternatively argues that the Lease expired before the Meza Incident occurred, discussed *infra* in Section III.B.

11

policy, when it refused to defend and indemnify AQP. *See* Denial Letters, Docs. No. 50-15, 47-12, 47-14.

    B.  <u>Temporal Coverage of Lease Agreement</u>

The parties dispute whether the Lease expired before the Meza Incident occurred on March 10, 2015.[7] Grange argues the Lease's "04 months" coverage only could have been extended via written modification of the Lease. AQP argues the Lease's temporal coverage did not need to be modified through written modification of the contract.

I agree with AQP's interpretation of the Lease. Extending the contact's temporal coverage is provided for in the contract itself. The "Length of Rental" for APQ's crane was "04 months, thereafter at option of lessor and lessee." Doc. No. 50-4 at 2. The Lease "may not be waived or modified orally," *id.* at 6, but the Lease's term of "04 months, thereafter at option of lessor and lessee," provides that US Framing and AQP could extend the lease beyond four months if they exercised their option to do so.

The Lease was extended beyond four months either orally or via the parties' conduct. *See* S. Schrade Dep., Doc. No. 50-16 at 18-19 ("The job kept going on so they needed the crane so it just kept – kept going. . . . And they continued to pay for it. Q. And that was by agreement; correct? A. Yes."); J. Schrade Dep., Doc. No. 65-3 at 11 (testifying that the crane was "used for the period from November 6th of 2014 to the end of April of 2015" and that US Framing "pa[id] A-Quick Pick for the use of that crane in accordance with the terms of the bare rental [Lease] agreement"); *see* US Framing Responses to AQP's Requests for Admission, Doc. No. 65-4 at 4

---

[7] The crane was used at the jobsite for almost six months, until the end of April 2015. J. Schrade Dep., Doc. No. 65-3 at 11. US Framing paid AQP for the crane throughout that period in accordance with the Lease's terms. *Id.*

(US Framing paid each of AQP's invoices for the crane rental). US Framing and AQP exercised their option to extend the Lease beyond four months; doing so did not modify the Lease.

Because the Lease had not expired at the time of the Meza Incident, AQP remained an Additional Insured at the time of the Meza Incident.

C. Implied Covenant of Good Faith and Fair Dealing

Grange and AQP cross-moved for summary judgment on AQP's third count for breach of the implied covenant of good faith and fair dealing. Ironshore does not assert a bad faith claim against Grange.

"It is axiomatic that the implied duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship." *Hoskins v. Titan Value Equities Grp., Inc.*, 252 Conn. 789, 793 (2000). Breach of the covenant requires bad faith. *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004). "Bad faith . . . implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Id.* (quoting *Habetz v. Condon*, 224 Conn. 231, 237 (1992) (cleaned up).

AQP alleges that "Grange's continued refusal to acknowledge its coverage obligations" demonstrates a "dishonest attempt" to skirt its obligations. Doc. No. 47-1 at 23. As evidence of bad faith, AQP provides three denial letters written by Grange. Docs. No. 50-15, 47-12, 47-14.

The Grange denial letters contain many of the same arguments set forth in the Grange summary judgment briefing. The only indicia of pretextual bad faith is in Grange's November 30, 2020 denial letter, doc. no. 50-15. Grange claimed, "US Framing, Inc. was not a Named Insured at the time of the [Meza] accident, and any attempt to add US Framing, Inc. after-the-

fact would implicate the known loss provisions in the Policy[.]" *Id.* at 7.  Grange's own records reflect that US Framing was undisputedly a Named Insured when the Meza Incident occurred and when Grange sent that denial letter.  List of Certificate Holders, Doc. No. 49-13 at 2 (US Framing listed as "Named Insured" from 10/01/2014 to 10/01/2015).

Even so, viewing the evidence in the light most favorable to Grange, AQP has not provided sufficient evidence to show that Grange operated in bad faith as a matter of law.  Likewise, viewing the evidence in the light most favorable to AQP, Grange has not provided sufficient evidence that it acted in good faith when it refused to indemnify AQP.  I therefore deny both parties' motion for summary judgment regarding Count Three.

D. Ironshore's Claim of Equitable Subrogation

Ironshore brings a claim of equitable subrogation claim against Grange.  Equitable subrogation "enables an insurance company that has made a payment to its insured to substitute itself for the insured and to proceed against the responsible third party."  *Pac. Ins. Co., Ltd. v. Champion Steel, LLC*, 323 Conn. 254, 261 (2016).  "[T]he doctrine has long been available to an insurer seeking reimbursement for a loss it indemnifies when a third party is liable for such loss."  *Id.* at 262.  "As now applied, the doctrine of legal or equitable subrogation is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter."  *Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*, 2008 WL 2951865, at *5 (D. Conn. July 31, 2008), *aff'd*, 337 F. App'x 13 (2d Cir. 2009) (quoting *Wasko v. Manella*, 269 Conn. 527, 532-33 (Conn. 2004)).

Ironshore insured AQP for Commercial General Liability at the time of the Meza Incident.  *See* Ironshore Policy, Doc. No. 50-26 at 2.  Aside from a $5,000 deductible, Ironshore

14

paid AQP's attorneys' fees, expenses, and the *Meza* settlement amount. Lee Aff., Doc. No. 47-26 ¶¶ 12, 16. Because Grange's insurance policy provided the primary coverage for AQP, doc. no. 47-9 at 99, Grange triggered Ironshore's right to equitable subrogation when it breached the Grange Policy.

Ironshore cannot obtain equitable subrogation for AQP's bad faith claim because Ironshore only paid the debts that AQP incurred from Grange's breach of contract. *See generally* Lee Aff., Doc. No. 47-26. Ironshore is entitled to equitable subrogation for Grange's liabilities to AQP stemming from the breach of contract—*i.e.*, "fees and expenses incurred by counsel for A-Quick Pick in the Meza Action and in this action, and for the amount paid to settle the bodily injury claim by Mr. Meza." *Id.* Ironshore's recovery will reduce AQP's damages dollar-for-dollar because equitable subrogation prohibits double recovery. *Pac. Ins. Co.*, 323 Conn. at 262.

I therefore grant summary judgment in favor of Ironshore on Count Four.

### IV. Conclusion

For the reasons set forth above, I **grant in part** AQP and Ironshore's Motion for Summary Judgment, **doc. no. 47**, regarding Counts One, Two, and Four, and **deny in part** AQP and Ironshore's Motion for Summary Judgment regarding Count Three. I **deny** Grange's Motion for Summary Judgment, **doc. no. 48**, in its entirety.

I conclude there is no just reason to delay entering judgment regarding Count One. *See* Fed. R. Civ. P. 54(b). I direct the Clerk to enter a declaratory judgment in favor of AQP on Count One against Grange.

Count Two, Breach of Contract, and Count Four, Equitable Subrogation, shall proceed to trial on damages. Count Three, Breach of the Implied Covenant of Good Faith and Fair Dealing, shall proceed to trial on liability and damages.

So ordered.

Dated at Bridgeport, Connecticut, this 16th day of December 2024.

<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge